# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

Gabriel A Alkhdour, Pro Se
11650 Penn Hills Drive Suite 27105
Pittsburgh, Pennsylvania 15235,
(412)770.5285

**Plaintiff,**

Case No: 2:21-cv-1256

1539
#4
Summons Issued to U.S. Dept. State
Fee Paid

vs.

**Complaint for Declaratory and Injunctive Relief**

ANTONY J. BLINKEN , Secretary of the
U.S. Department of State
c/o Executive Office
Office of the Legal Advisor
Suite 5.600
600 19th St. NW
Washington, D.C. 20522;

FILED

SEP 20 2021

CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

Ambassador Carol Z. Perez,
The Under Secretary for Management
U.S. Department of State
c/o Executive Office
Office of the Legal Advisor
Suite 5.600
600 19th St. NW
Washington, D.C. 20522;

Rena Bitter, Assistant Secretary
Bureau of Consular Affairs
U.S. Department of State
c/o Executive Office
Office of the Legal Advisor
Suite 5.600
600 19th St. NW
Washington, D.C. 20522;

Cliff Seagroves, Acting Director
Office of Foreign Missions
U.S. Department of State
c/o Executive Office
Office of the Legal Advisor
Suite 5.600
600 19th St. NW
Washington, D.C. 20522;

U.S. DEPARTMENT OF STATE
c/o Executive Office
Office of the Legal Advisor
Suite 5.600
600 19th St. NW
Washington, D.C. 20522;

**Defendants,**

## INTRODUCTION

1.  This is an immigration case involving the United States Government's violation of the U.S Constitution, Violation of the Administrative Procedure Act, and Violation of  Customary International Law.

2.  I, the Plaintiff, Gabriel A Alkhdour., married my wife Doaa M Z Ahmad-Abdullah on February 14, 2019.

3.  My wife Doaa M Z Ahmad-Abdullah is a Syrian National and currently residing in Damascus, Syria.

4.  On October 09, 2019, I traveled to Damascus, Syria to visit my wife and I haven't seen her since.

5.  My wife's immigration case for Immediate Relative (IR1), **NVC Case Number: DMS2020510009**, was documentarily qualified (DQ) and all fees has been paid on March 24, 2020. Since March 24, 2020, and up to date the case has been on hold at the National Visa Center (NVC) waiting visa interview appointment with the U.S. Embassy in Amman, Jordan. Also I haven't received any updates or communication from either party until I contacted them on July 04, 2020.

6.  Due the ongoing Civil War in Syria there is no U.S. representation and the U.S. Embassy in Amman, Jordan is assigned to handle Syrian affairs.

7.  On July 04, 2020, I contacted the National Visa Center, U.S. Embassy in Amman, Jordan, and the U.S. Department of State via email asking for an assistance regarding my wife's case because of the Civil War escalation, humanitarian, and security deterioration in Syria, and due to the implantation of the Caesar Act which came into force on June 17, 2020, which made Syria situation more volatile.

8.  On July 04, 2020, I received an automatic reply from the U.S. Embassy in Amman, Jordan stating to follow the Embassy website for updates.

9.  On July 08, 2020, I received an automatic reply from the U.S. Department of State advising me to contact the U.S. Embassy for updates.

10. On July 10, 2020, I received an automatic response from the National Visa Center stating that the case is documentarily complete and waiting for the U.S. Embassy in Amman, Jordan resumption of routine visa services.

11. On July 10, 2020, I contacted the National Visa Center via email requesting an emergency interview for my wife.

12. On July 11, 2020, I received an email response from the National Visa Center requesting additional details regarding the emergency interview.

13. On July 12, 2020, I sent an email to the National Visa Center and attached a letter to the email explaining the reasoning for my wife's emergency interview request and that her life and her family life's are at risk due to the situation in Syria becoming very dangerous.

14. On July 16, 2020, I received an email response from the National Visa Center stating that my request is being forwarded to the U.S. Embassy in Amman, Jordan for their consideration.

15. On July 23, 2020, I received an email response from the National Visa Center stating that my application for emergency interview was denied out of fairness to other applicants.

16. On August 31, 2020, I sent an email to the U.S. Embassy in Amman, Jordan inquiring about the visa interview processing status.

17. On September 03, 2020, The U.S. Embassy in Amman, Jordan, sent the following response" Unfortunately, the mentioned case has not been sent to the US Embassy in Amman yet. Please, wait for a notification from NVC informing you about your interview date or you may wish to contact the National Visa Center at NVC_Inquiry@state.gov, or (+1) 603-334-0700 for an update on the status of your case.

"Please note, the borders between Syria, Jordan, and Lebanon are currently closed. Unfortunately, we will not be able to schedule appointments for applicants living in Syria until travel restrictions between Syria, Lebanon, and Jordan are no longer in place".

18. On September 03, 2020, I sent an email to the National Visa Center requesting a case transfer to a different Embassy or Consulate aside from the U.S. Embassy in Amman, Jordan. I mentioned to the National Visa Center the response from the U.S. Embassy, Amman, Jordan, dated September 03, 2020, Paragraph 17. I made sure to mention in my email to the National Visa Center the political environment,

disagreement, tension, and conflict between Syria, Lebanon, and Jordan and that Lebanon and Jordan have been very restrictive and discriminatory in their policies towards the Syrian people even before Syria's Civil War. In fact, these policies Lebanon and Jordan implemented towards the Syrian people became more aggressive during Syria's Civil War.

19. On September 05, 2020, I received an email response from the National Visa Center stating I am permitted contact the Embassy(s) or Consulate(s) that I wish to transfer my wife's case to and if the Embassy(s) or Consulate(s) approve my request the National Visa Center will transfer the case.

20. On September 10, 2020, I sent emails to the U.S. Embassy in Cairo, Egypt, U.S. Embassy in Khartoum, Sudan, and the U.S. Embassy in Ankara, Turkey asking them if they will accept my wife's case transfer from the U.S. Embassy in Amman, Jordan  based on the National Visa Center response dated September 05,2020.

21. On September 10, 2020, I received a generic automatic response from the U.S. Embassy in Khartoum without addressing my request up to date.

22. On September 13, 2020, I received an email response from the U.S. Embassy in Cairo, Egypt, stating the following" Please note that you need to contact NVC with transfer request, then they will contact us and we will inform them our decision, these are the instructions that you need to follow for the transfer of file process."

23. On September 15, 2020, I received an email response from the U.S. Embassy in Ankara, Turkey stating that they can't accept the file transfer because my wife is not a resident of Turkey.

24. On March 04, 2021, I received the first email (automatic Email) from the National Visa Center since March 24, 2020, stating that my wife's file is documentarily complete and waiting for the U.S. Embassy in Amman, Jordan resumption of routine visa services.

25. On June 06, 2021, I received an automatic email from the National Visa Center similar to the one I received on March, 04, 2021.

26. On August 04, 2021, I contacted the National Visa Center via phone and I asked the representative if I have an option to transfer my wife's case to the United States considering the fact that her case file is complete and all she need is an immigrant visa interview. The representative stated that I have to contact the U.S. Citizenship and Immigration Services (USCIS) as they have the authority to transfer my wife's file to the United States for her immigrant visa interview.

27. On August 04, 2021, I contacted the U.S. Citizenship and Immigration Services (USCIS) via phone. The representative stated that my wife's case is out of their jurisdiction and there is nothing they can do. The representative stated that to reach out back to the National Visa Center, and the U.S. Embassy, Amman, Jordan for a resolution.

28. On August 04, 2021, I called back the National Visa Center and I mentioned the U.S. Citizenship and Immigration Services (USCIS) response. The National Visa Center representative stated that to contact the U.S. Embassy in Amman, Jordan, and request my wife's case to be transferred to the United States for her immigrant visa interview.

29. On August 05, 2021, I contacted the U.S. Embassy in Amman, Jordan, requesting they transfer my wife's file to the United States.

30. On August 12, 2021, The U.S. Embassy in Amman, Jordan, responded with the following statement" Unfortunately, the mentioned case has not been sent to the U.S. Embassy in Amman yet. Please, wait for a notification from the NVC informing you about your interview date".

## JURISDICTION AND VENUE

31. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), the Fifth Amendment to the United States Constitution ("Due Process Clause"), the Eighth Amendment to the United States Constitution ("Cruel and Unusual Punishments Clause"), The Administrative Procedure Act (Arbitrary and Capricious). 5 U.S.C. §§ 701-706, United Nations for Human Rights ("Universal Declaration of Human Rights, article.1"), Inter-American Commission on Human Rights ("American Declaration of The Rights and Duties of Man, Chapter 1, Article I and VI"), American

4

Convention on Human Rights ("Pact of San Jose, Costa Rica (B-32), Part I - State Obligations and Rights Protected, Chapter I - General Obligations, Article 4, 5, 7, 17, 22").

32. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because this action is brought against an agency of the United States, and the officers of the agency of the United States in their official capacities.

## PARTIES

## Plaintiff

33. I, the Plaintiff, Gabriel A Alkhdour, a United States citizen and the petitioner for my wife Doaa M Z Ahmad-Abdullah who is the beneficiary in an immigration case for Immediate Relative (IR1), **NVC Case Number: DMS2020510009.**

## Defendants

34. Defendant Antony J. Blinken is the Secretary of U.S. Department of State ("DOS") and is being sued in his official capacity. The Secretary of State is responsible to carry out the President's foreign policies through the State Department, which includes the Foreign Service, Civil Service, and U.S. Agency for International Development.

35. Defendant Ambassador Carol Z. Perez is the Acting Under Secretary of State for Management at the U.S. Department of State ("DOS") and is being sued in her official capacity. As Acting Under Secretary for Management, she is responsible for the people, resources, budget, facilities, technology, financial operations, consular affairs, logistics, contracting, and security for Department of State operations, and is the Secretary's principal advisor on management issues.

36. Defendant Rena Bitter, Assistant Secretary, Bureau of Consular Affairs at the U.S. Department of State ("DOS") and is being sued in her official capacity. As an assistant Secretary she is responsible for the facilitation of legitimate travel to the United States.

37. Defendant Cliff Seagroves, Acting Director, Office of Foreign Missions at the U.S. Department of State ("DOS") and is being sued in his official capacity. As Acting Director he is responsible for

implementing the Secretary's mandate under the Foreign Missions Act (22 U.S.C. 4301-4316) to facilitate secure and efficient operations of U.S. missions abroad, and of foreign missions and international organizations in the United States. Office of Foreign Missions has four missions: employment of reciprocity to ensure equitable treatment for U.S. diplomatic and consular missions abroad and their personnel through reciprocity; regulation of the activities of foreign missions in the U.S. in a manner that will protect the foreign policy and national security interests of the U.S.; protection of the U.S. public from abuses of privileges and immunities by members of the foreign missions.

## FACTUAL BACKGROUND

38. My wife and I have been separated for 23 months and soon will be our third Christmas apart.

39. The separation from my wife placed an immense amount of financial, emotional, and physical strain on me.

40. My wife and her family live in a very dangerous situation due to the Syrian Civil War.

41. The Civil War in Syria and Syria's isolation caused serious humanitarian crisis and the people are lacking the simplest form of human rights such as the rights to life, dignity, liberty, and security.

42. My wife and her family along with the Syrian people are subjected to cruel, inhuman or degrading treatment on daily basis.

43. Airstrikes, explosions, clashes' occur daily in and around Damascus and some of the airstrikes were in close proximity to where my wife and her family live. At times I fear that I might lose my wife at any moment due to an airstrike, or bombing which is a common occurrence in residential neighborhoods in and around Damascus.

44. On July, 22, 2020, the U.S. Department of State announced the following:" In response to significant worldwide challenges related to the COVID-19 pandemic, the Department of State temporarily suspended routine visa services at all U.S. Embassies and Consulates. Embassies and consulates may now enter a phased resumption of visa services. As resources allow, embassies and consulates will

continue to provide emergency and mission critical visa services and will resume routine visa services as local conditions and resources allow".

45. On February 01, 2021, the U.S. Department of State released statement titled **Attacks on Civilians in Syria**" The United States condemns the terrorist attacks this past weekend in Azaz, al-Bab, and Afrin that resulted in the deaths of at least 20 civilians, including children.  We extend our sincere condolences to the families of civilians killed and wish a quick recovery to those wounded in these despicable and senseless acts of violence.

The United States is deeply alarmed by the frequency of such attacks in recent months, including the repeated use of vehicle-borne improvised explosive devices.  Those responsible for perpetrating the violence should be brought to justice. Their actions endanger the Syrian people and threaten to destabilize the region further".

46. On February 24, 2021, the U.S. Embassy in Amman, Jordan, released the following statement titled **Special Instructions for Syrian Applicants.** Below is partial statement from the release.

"We will resume regular visa services for applicants located in Syria as soon as airlines resume normal travel options and the Government of Jordan resumes normal entry procedures into Jordan Until that time, applicants may encounter difficulties- including denial of boarding in Damascus or Beirut and denial of entry into Jordan.  In addition to air travel restrictions, we cannot assist visa applicants attempting to enter Jordan through land border crossings".

47. On March 02, 2021, the U.S. Secretary of State said" Using people, human beings, as pawns for political purposes, it is totally unacceptable conduct by any country".

48. On March 10, 2021, The United Nations released news story titled **Peace and Security**. Secretary-General António- Guterres stated the following" The world has watched Syria spiral into destruction and bloodshed in a conflict that has left no family there untouched.  Hundreds of thousands of Syrians have died, millions been displaced, and countless more remain illegally detained, disappeared or living in uncertainty. "It is impossible to fully fathom the extent of the devastation in Syria, but its people have

endured some of the greatest crimes the world has witnessed this century", he said, recalling the humanitarian violations, sieges, chemical weapon attacks and other horrors committed during the war. The Secretary-General stressed the need to continue providing humanitarian assistance to the Syrian people, warning that around 60 per cent of the population risks going hungry this year. More humanitarian access is needed. Intensified cross-line and cross-border deliveries are essential to reach everyone in need everywhere. This is why I have repeatedly urged the Security Council to achieve consensus on this crucial matter", he said.

49. On March 30, 2021, the U.S. Department of State released **Syria 2020 Human Rights Report**. The report was 70 pages long in which highlighted the instability and the abuses implemented on the Syrian people.

50. On April 01, 2021, the U.S. Secretary of State said" It's about holding up the international rules-based system that all of us have invested so much into over the last 75 years. And it has served our interests and our values very well".

51. On April 09, 2021, the U.S. Secretary of State said" The lives of people in Syria depend on getting urgent help. We have to do everything in our power to create ways for that aid to get to them – to open pathways, not to close them".

52. On May 09, 2021, the U.S. Secretary of State said "Human rights and dignity must stay at the core of the international order. The foundational unit of the United Nations – from the first sentence of the Charter – is not just the nation state. It's also the human being".

53. On May 17, 2021, President Joe Biden said "All human beings should be treated with respect and dignity and should be able to live without fear no matter who they are or whom they love.".

54. On July 17, 2021, the U.S. Department of State made the following statement" President Joe Biden has put human rights at the center of U.S. foreign policy, affirming that the United  States commitment to prevent and respond to atrocities globally is a matter of U.S. national security and moral responsibility.

8

55. On August 22, 2021, the U.S. Embassy in Amman, Jordan, made an announcement titled **Embassy Update on Student Visa Processing** "Since our latest update on August 12, we successfully scheduled over 150 Jordanian students for visa interviews to study in the United States this fall semester.  To date, we assisted almost every student we are aware of with a start date of September 2 or earlier.  We continue to work with students who are scheduled to start their classes after September 2".

56. On September 13, 2021, the U.S. Department of state updated its previous **Immigrant Visa Prioritization** which it says in part "Consistent with those objectives, U.S. embassies and consulates are using a tiered approach to triage immigrant visa applications based on the category of immigrant visa as they resume and expand processing.  While our consular sections, where possible, are scheduling some appointments within all four priority tiers every month, the following lists the main categories of immigrant visas in priority order:

- Tier One: Immediate relative intercountry adoption visas, age-out cases (cases where the applicant will soon no longer qualify due to their age), certain Special Immigrant Visas (SQ and SI for Afghan and Iraqi nationals working with the U.S. government), and emergency cases as determined on a case-by-case basis.

- Tier Two:  Immediate relative visas; fiancé(e) visas; and returning resident visa.

- Tier Three: Family preference immigrant visas and SE Special Immigrant Visas for certain employees of the U.S. government abroad

- Tier Four: All other immigrant visas, including employment preference and diversity visas.

57. The Syrian people have been discriminated against from Lebanon and Jordan even before the Syrian Civil War yet it became more aggressive and frequent during the Syrian Civil War and up to date.

58. Syria invaded Lebanon in May 31, 1976 and occupied Lebanon until April 30, 2005. Due to the Syrian occupation of Lebanon the Lebanese government in particular restricts the Syrian people movement and their livelihood through their shared borders sea, land, and air. The Syrian people don't have the rights

9

and protections of the Lebanese people. The Syrian people in Lebanon aren't allowed to work in many

professions and discriminated against by Lebanese government and the Lebanese people.

59. According to **Human Rights Watch 2018 Report on Lebanon**, Refugee section stated the following"

More than 1 million Syrian refugees are registered with the United Nations High Commissioner for

Refugees (UNHCR) in Lebanon. The government estimates the true number of Syrians in the country to

be 1.5 million.

Lebanon's residency policy makes it difficult for Syrians to maintain legal status, heightening risks of

exploitation and abuse and restricting refugees' access to work, education, and healthcare. Seventy-four

percent of Syrians in Lebanon now lack legal residency and risk detention for unlawful presence in the

country. In March, Lebanon lifted some restrictions to residency for Syrian refugee children age 15-18.

In 2017, Lebanese authorities stepped up calls for refugees to return to Syria and put pressure on

UNHCR to organize returns despite the ongoing conflict in Syria and well-founded fears of persecution

held by many refugees.

Lebanese authorities estimated that from July to November, between 55,000 and 90,000 refugees

returned to Syria under localized agreements not overseen by UNHCR. Refugees have said they are

returning because of harsh policies and deteriorating conditions in Lebanon, not because they think

Syria is safe. On November 3, the Minister for Refugee Affairs said that about 20 refugees, including at

least 2 children, have been killed by Syrian regime forces since their return.

Municipalities in Lebanon have forcibly evicted thousands of refugees in mass expulsions without a

legal basis or due process. Tens of thousands remain at risk of eviction. In 2018, Lebanon continued to

impose entry regulations on Syrians that effectively barred many asylum seekers from entering

Lebanon".

60. On July 08, 2019, a report was published by Atlantic Council titled **Syrians in Lebanon: A life of**

**misery, or a return to the unknown** stated the following" Ongoing discrimination and anti-refugee

rhetoric in Lebanon are leaving desperate Syrians with two dismal options: to live under harsh conditions in Lebanon or return to Syria with worse conditions and even less stability.

The presence of around 1.5 million Syrian refugees in Lebanon is viewed by many Lebanese as a heavy burden and a threat to the country's security. Syrian refugees are often blamed for everything that goes wrong in Lebanon—including the country's social, economic, and political woes—and face various forms of discrimination, racism, and abuse. Anti-refugee sentiment is perpetuated by Lebanese actors, journalists, and media. Lebanese leaders from across the political spectrum utilize anti-refugee rhetoric and look for ways to push Syrians to go back home.

In his latest campaign to "defend Lebanese workers against any other foreign worker" and put "Lebanon first," Lebanese Foreign Minister Gebran Bassil blamed the country's unemployment on Syrian refugees and accused "illegal Syrian workers" of stealing jobs and impacting Lebanon's labor market.

At a conference organized in June, by the Free Patriotic Movement to discuss refugee return, Bassil announced that "we will not accept Lebanese to stay without jobs while Syrian refugees work illegally." According to Basil, only 5,000 Syrians are authorized to work in Lebanon. It is thus "within the power of local authorities to prevent Syrians from working, except in farming, cleaning, and construction," as Basil declared in the conference. Subsequently, tens of campaigners from Gebran Bassil's Free Patriotic Movement protested in front of Syrian shops, shouting "Syria, you must leave!" Flyers were also distributed, calling on Lebanese to "protect Lebanese workers and report violators."

Lebanese politicians continue to present the refugee issue as "the obstacle" to Lebanon's growth and development, emphasizing that Lebanon can't move forward as long as it hosts Syrians. "We can't save our economy when 1.5 million non-Lebanese are working in our places," declared Basil in May.

Lebanese authorities, supported by many of its citizens, are intensifying institutionalized discrimination and systematic violations to push Syrians back home whether it is safe to return or not.

In April, the Lebanese government announced that it would be dismantling houses of Syrian refugees in the town of Arsal if housing was incompatible with new planning rules—which require any walls higher

11

than five rows of bricks to be demolished—in order to avoid permanent refugee housing communities. Refugees themselves tore down the homes they lived in just to comply and not be forced to leave. However, at least 20 concrete settlements in Arsal were demolished by Lebanese authorities last Monday after the July 1 deadline. Aid groups estimated that the decision would impact about 15,000 people, including many children, living in 3,000 homes.

In addition, hundreds more Syrian refugees were displaced and their tents dismantled in recent escalations. Last month, Lebanese authorities ordered the evacuation of dozens of Syrian refugees in eastern Lebanon following a brawl with locals. Hundreds of Syrians were also left homeless after a refugee camp in Deir al-Ahmar was set on fire in early June by "unknown attackers."

Lebanese authorities have also been deporting registered refugees and forcing them to sign "voluntary repatriation forms." It is estimated that some thirty Syrians were deported from Hariri International Airport in Beirut this year, despite Lebanon's obligation "not to return or extradite anyone if there are substantial grounds for believing the person would be in danger of being subjected to torture," according to HRW.

Lebanese authorities also forced refugees to return to Syria in 2018 due to an agreement between the Lebanese and Syria governments to send refugees to "safe areas" in Syria. It is reported that the security office in the city of Zgharta confiscated identification documents of refugees as they sought to renew their residency permits. The refugees where then forced to sign voluntary return forms to return to Syria. Refugees in other areas were also mislead into signing what they were told were registry documents. They were then notified that they had instead signed an agreement to go back to Syria within a month.

61. According to **Human Rights Watch 2019 report on Jordan**, Refugees and Migrants section stated the following" In 2019, Jordanian authorities did not allow aid deliveries from Jordan to tens of thousands of Syrians at Rukban, an unorganized camp along Jordan's border with Syria. Camp residents have been besieged by Syrian government-aligned forces since 2018 and face limited access to food, water, and

medical assistance. In late August, a UN official said that the UN would help facilitate voluntary evacuations of camp residents to other parts of Syria, and that only 12,700 people remained in the camp. Jordan hosted around 70,000 migrant domestic workers in 2019, mostly from the Philippines, Sri Lanka, and Indonesia. NGOs repeatedly referred domestic workers who had suffered multiple abuses to labor ministry investigators. Abuses included non-payment of wages, unsafe working conditions, long hours, document confiscation, and physical, verbal and sexual abuse.

62. On July 19, 2021, **Amnesty International USA** wrote to President Joe Biden urging him to raise key human rights concerns in Jordan regarding refugee rights and discrimination. The report stated the following" Concerning Syrian refugees, Jordan has forcibly detained and transferred at least 16 Syrian refugees, half of them children, to the "berm" – a no man's land located in the desert between Syria and Jordan. They joined at least 10,000 Syrian refugees already restricted to living in the berm, all of whom lack access to adequate food, clean water, medical care and sanitation. One family even chose to return to a dangerous government-controlled area in Syria rather than remain in camps where poor conditions prevail. Refugees living in the arid berm suffered even further from limited access to humanitarian aid and medical equipment after Jordanian authorities decided to bar aid convoys from crossing into the region to deliver humanitarian aid and medical equipment, claiming it to be a COVID-19-prevention measure. However, the refugee population was instead left at greater risk with no consistently available, let alone sufficient, medical care, particularly impacting pregnant people for whom health care was entirely cut off.

Syrian refugees and migrants have been systemically and disproportionately harmed by policies imposed to limit the spread of COVID-19. They suffered significant economic harms due to a largely informal employment structure that UNHCR estimates resulted in one third of Jordan's Syrian refugees – overwhelmingly lacking official work permits and thereby stranded – losing their jobs in 2020, resulting in a 40% drop in income for the refugees. Thousands of them lacked access to special protection or alternative employment. In violation of international law, Syrian and Palestinian refugees continue to

face discrimination, as they remain unfairly and unreasonably barred from several broad employment sectors, from public health and education to engineering and technical professions. For those refugees specifically from the Gaza Strip, lack of Jordanian citizenship strips them of rights and access to essential services available to the rest of the population.

63. On July 31, 2021, a news story was published by **Reuters** stating the following" Jordan will temporarily close the Jaber border crossing with Syria for the movement of goods and passengers "as a result of developments in the security situation on the Syrian side", state news agency Petra said on Saturday, citing an Interior Ministry official.

The official added that the crossing will be reopened "if the appropriate conditions are in place"

64. In Lebanon and Jordan there is no freedom of speech or expression and both governments crack down on media and reporters to prevent the latter from exposing their human right violations. Both countries control borders with Syria via land, sea, and air. Both governments open and close the border with Syria as they see fit and without any notice, and refuse any Syrian citizen from entering Lebanon and Jordan for no valid reason accept they are Syrian Nationals.

65. From March 24, 2020, until March 04, 2021, I haven't received any updates or communication from the National Visa Center nor the U.S. Embassy in Amman, Jordan. According the U.S. Department of State, FOREIGN AFFAIRS MANUAL AND HANDBOOK, 9 FAM 504.7-2 Requirement for an Interview

**Timeliness of Interview**: The interview with the consular officer is the most significant part of the visa issuing process. It is particularly important from the point of view of full and correct application of the law. Section 237 of Public Law 106-113 and subsequent legislation require that the Department establish a policy under which immediate relative (and fiancé(e)) visas be processed within 30 days of receipt of the necessary information from the applicant and the Department of Homeland Security (DHS); all other family-based immigrant visas (IV) must be processed within 60 days. The Department expects all posts to strive to meet the 30/60-day requirements.

14

66. In paragraphs 17, 18, 19, 20, and 22, the National Visa Center statements were deceiving and misleading. Both U.S. Embassies in Cairo and Amman stated that my wife's case is with the National Visa Center and both Embassies have no jurisdiction over the case.

67. In paragraphs 26, 27, 28, 29, and 30, the National Visa Center made the same misleading statements once more by asking me to contact USCIS and ask them to transfer my wife's case to the United States. USCIS stated that they have no jurisdiction over the case and to reach back to the National Visa Center and the U.S. Embassy in Amman, Jordan, The National Visa Center stated that if the U.S. Embassy in Amman, Jordan agreed to the transfer of the Case to the United States for processing the National Visa Center will change the venue. The U.S. Embassy in Amman, Jordan insisted that they don't have my wife's case and the National Visa Center is the case custodian.

68. On the National Visa Center website, About Us, Visa section states the following" The Office of Visa Services, in the Consular Affairs Bureau, Department of State provides various functions:

- We serve as liaisons with the Department of Homeland Security
- We serve as liaisons between the Department of State and U.S. Embassies and Consulates abroad on visa matters
- We interpret visa laws and regulations, and act as a point of contact for the public.

69. On July 26, 2019, The National Visa Center released news story titled **Twenty-Fifth Anniversary of National Visa Center** mentioning their responsibility and obligation in the immigration system "On July 26, 2019, the Department of State's National Visa Center (NVC) celebrated its twenty-fifth anniversary in a public ceremony in Portsmouth, NH, attended by senior Department officials and state and local dignitaries.  In keeping with NVC's key role in the immigrant visa process, the event included a naturalization ceremony at which 25 candidates took the oath of allegiance and became U.S. citizens. Since 1994, NVC has carried out a critical part of the immigrant visa process, serving as the link between U.S. Citizenship and Immigration Services (USCIS) and the U.S. Department of State. Once USCIS approves an immigrant visa petition, NVC handles key visa pre-processing steps to prepare applications for the final visa interviews conducted at U.S. embassies and consulates abroad.

15

As noted by Principal Deputy Assistant Secretary for Consular Affairs Ian Brownlee, "Since its opening in 1994, NVC has received more than twelve and a half million immigrant visa petitions from USCIS and has sent more than seven and a half million to our consular sections overseas for interview and visa issuance. Behind each of these numbers is a story of family connection, economic opportunity, and contribution to the rich and diverse fabric of the United States."

70. The U.S. Department of State and The National Visa Center clearly violated their own rules and failed to perform their duties.

71. In paragraph 56 the U.S. Embassy in Amman, Jordan, successfully scheduled 150 student visa interviews instead of posturizing immediate relative visas.

72. The only reason my wife's case was and still on hold by the U.S. Department of State and National Visa Center is due to the COVID-19 pandemic and its complications.

73. I have evidence that from the beginning of the pandemic and up to the present date showing U.S. Official's, U.S. Department of State officials and diplomats, Officials in the U.S. Embassy Amman, Jordan, Jordanian officials, Lebanese officials violating the Centers for Disease Control and Prevention ("CDC") and the World Health Organization ("WHO") COVID-19 guidance while We the People have to obey the rules. I have seen the above mentioned officials while in their official capacity in large gatherings, unmasked, shoulder to shoulder at times, and some enjoying outings such as hiking, lunches, social events as if life was back to pre-pandemic conditions for them, yet I can't have a life with my wife as a family unit. During times of crisis family should be together not separated and treated unjustly.

74. U.S. Officials when they took office swore to uphold the law and the constitution and to serve the American people, not the other way around.

75. In 1776 Thomas Jefferson said:

   **"We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness."**

# FIRST CAUSE OF ACTION
## (Violation of the Eighth Amendment, Cruel and Unusual Punishments Clause)

76. Plaintiffs repeat and reallege the averments in all preceding paragraphs of this complaint.

77. Pursuant to 42 U.S. Code § 1983 - Civil action for deprivation of rights. Gomez v Toledo, 446 US 635, 638 (1980).

78. The Cruel and Unusual Punishment Clause of the Eighth Amendment applies to all "persons" on United States soil and thus applies to myself the Plaintiff.

79. In *Furman v. Georgia*, 408 U.S. 238 (1972), Justice Brennan wrote, "There are, then, four principles by which we may determine whether a particular punishment is 'cruel and unusual'."

- The "essential predicate" is "that a punishment must not by its severity be degrading to human dignity," especially torture.
- "A severe punishment that is obviously inflicted in wholly arbitrary fashion."
- "A severe punishment that is clearly and totally rejected throughout society."
- "A severe punishment that is patently unnecessary."

80. My wife and I have interest under the Cruel and Unusual Punishment Clause to be treated with human dignity and fairness. To be united as a family after being separated for about 24 months without a crime being committed, accept the fact that we are both law abiding citizens.

81. My wife and I have been deprived of our dignity and humanity by the United States, Jordan, and Lebanon.

82. The separation of my wife and I violates our due process because it furthers no legitimate purpose, not to mention a compelling governmental interest.

83. The separation between my wife and I also violates procedural due process because it was undertaken without any hearing.

# SECOND CAUSE OF ACTION
## (Violation of the Fourteenth Amendment, Due Process Clause)

84. Plaintiffs repeat and reallege the averments in all preceding paragraphs of this complaint.

85. Pursuant to 42 U.S. Code § 1983 - Civil action for deprivation of rights. Gomez v Toledo, 446 US 635, 638 (1980).

86. The 14th Amendment protects a citizen from unreasonable control by the government

87. The 14th Amendment of the US Constitution provides all citizens with **equal protection of their right to life, liberty and property**. 'No state * * * shall deprive any person of life, liberty or property without due process of law.'

88. *In Prince v. Massachusetts,* 321 U. S. 158, 321 U. S. 166 (1944). The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment

89. Stanley v. Illinois, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972). The Court maintained that family preservation is a priority and that the U.S. Constitution protects family integrity

90. Meyer v. Nebraska, 262 U.S. 390 (1923); Pierce v. Society of Sisters, 268 U.S. 510 (1928). The Court has held that "the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition.

## THIRD CAUSE OF ACTION
### (Violation of the Administrative Procedure Act—Arbitrary and Capricious Practice)

91. Plaintiffs repeat and reallege the averments in all preceding paragraphs of this complaint.

92. This Court may review and set aside the U.S. Department of State and the National Visa Center actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A)(B).

93. This Court may further review and set aside U.S. Department of State and the National Visa Center actions in excess of statutory jurisdiction, authority, or limitations, or without observance of procedure required by law. 5 U.S.C. §§ 706(2) (C)-(D).

94. The U.S. State Department and the National Visa Center separation of my wife and me without a legitimate justification is arbitrary and capricious and accordingly violates the APA. 5 U.S.C. § 706.

95. On July, 22, 2020, the U.S. Department of State announced the suspension of routine visa services at all U.S. Embassies and Consulates. Embassies. The U.S. Department of State and the National Visa Center refused to transfer my wife's file to the U.S. Embassies I requested or to the United States based on their claim that my wife's case is with the U.S. Embassy in Amman, Jordan which is in contrary to the findings in paragraphs 17, 18, 19, 20, 22, 26, 27, 28. 29, 30, 68, and 69.

96. The U.S. Department of State and the National Visa Center applied COVID-19 rules and guidance and used it as a reason to delay my wife's case yet they did not obey the same rules Paragraph 73.

## FOURTH CAUSE OF ACTION
### (Violation of Inter-American Commission on Human Rights)

97.  In Filártiga *v. Peña-Irala*, *630 F.2d 876 (2d Cir.*, June 30 *1980*) the court claimed that Customary International Law "has always been part of the federal common law.".  Other courts have invoked history in claiming that it is "well settled" that customary international law has the status of federal common law.

98.  In The Paquete Habana, 175 U.S. 677 (1900), **Primary Holding** was Customary International Law is an accepted part of American law and can be applied by federal courts.

99.  In The Paquete Habana case Justice Gray said "International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination. For this purpose, where there is no treaty and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations, and, as evidence of these, to the works of jurists and commentators, not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is".

100. On June 06, 2007, Secretary Rice stated at **the American Society of International Law**" When we observe our treaty and other international commitments, …..other countries are more willing … to cooperate with us and we have a better chance of persuading them to live up to their own commitments. And so when we respect our international legal obligations and support an international system based on the rule of law, we do the work of making the world a better place, but also a safer and more secure place for America".

101. Customary International law plays a vital role in the protection of human rights.

102. Inter-American Commission on Human Rights, AMERICAN DECLARATION OF THE RIGHTS AND DUTIES OF MAN which was (Adopted by the Ninth International Conference of American States, Bogotá, Colombia, 1948), Chapter 1, Article I, and VI stated the following :

**19**

**Article I.**  Every human being has the right to life, liberty and the security of his person.

**Article VI.**  Every person has the right to establish a family, the basic element of society, and to receive protection therefore.

103. The IACHR is a principal and autonomous organ of the Organization of American States ("OAS") whose mission is to promote and protect human rights in the American hemisphere The Commission has its headquarters in Washington, D.C. Together with the Inter-American Court of Human Rights ("the Court" or "the I/A Court H.R.), installed in 1979, the Commission is one of the institutions within the inter-American system for the protection of human rights ("IAHRS").

104. My wife and I have been deprived of our human rights as mentioned in Article I, and VI.

## FIFTH CAUSE OF ACTION
### (Violation of the United Nations for Human Rights)

105. The Office of the High Commissioner for Human Rights (UN Human Rights), The international human rights, UNIVERSAL DECLARATION OF HUMAN RIGHTS, Articles, 1,3, 5, 6,7,12,13,14,15,and 16 states the following:

1. **All human beings are free and equal** All human beings are born free and equal in dignity and rights. They are endowed with reason and conscience and should act towards one another in a spirit of brotherhood.

3. **Right to life** everyone has the right to life, liberty and security of person.

5. **No torture and inhuman treatment** No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment.

6. **Same right to use law** everyone has the right to recognition everywhere as a person before the law.

7. **Equal before the law** All are equal before the law and are entitled without any discrimination to equal protection of the law. All are entitled to equal protection against any discrimination in violation and against any incitement to such discrimination.

12. **Right to privacy** No one shall be subjected to arbitrary interference with his privacy, family, home or correspondence, nor to attacks upon his honor and reputation. Everyone has the right to the protection of the law against such interference or attacks.

13. **Freedom to movement and residence** Everyone has the right to freedom of movement and residence within the borders of each state. Everyone has the right to leave any country, including his own, and to return to his country.

14. **Right to asylum** everyone has the right to seek and to enjoy in other countries asylum from persecution. This right may not be invoked in the case of prosecutions genuinely arising from non-political crimes or from acts contrary to the purposes and principles of the United Nations.

15. **Right to nationality** everyone has the right to a nationality. No one shall be arbitrarily deprived of his nationality nor denied the right to change his nationality

16. **Rights to marry and have family** Men and women of full age, without any limitation due to race, nationality or religion, have the right to marry and to found a family. They are entitled to equal rights as to marriage, during marriage and at its dissolution. Marriage shall be entered into only with the free and full consent of the intending spouses. The family is the natural and fundamental group unit of society and is entitled to protection by society and the State.

106. My wife and I are being deprived of all the mentioned above. We remain living apart and discriminated against to this day. All we want to do is live together as family.

## **RESERVATION OF RIGHTS**

Plaintiff reserve the right to add additional allegations of agency error and related causes of action upon receiving the certified administrative record.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that this Court grant the following relief:

(1) Assume jurisdiction over this matter;

(2) Declare that Defendants violated the United States Constitution, Customary International law

and the Administrative Procedure Act;

(3) Declare that Defendants' actions, as set forth above, are arbitrary and capricious, an abuse of

discretion, and not in accordance with law;

(4) Order the Department of State to transfer my wife's case to the United States;

(5) Order the Department of State to grant my wife an immediate entry to the United States;

(6) Order the appropriate agency(s) in the United States to conduct my wife's immigrant visa

interview or waive such interview due to the case is being documentarily complete and all fees

has been paid;

(7) Order the Department of State to grant my wife's parents and three brothers an immediate

admission to the United States as refugees and treat them as such;

(8) Order that all of the above shall be done expeditiously;

(9) Enter all necessary writs, injunctions, and orders as justice and equity requires; and grants such

further relief as this Court deems just and proper.

Respectfully submitted this the 20th day of September, 2021

<u>Gabriel A Alkhdour</u>
11650 Penn Hills Drive #27105
Pittsburgh, PA 15235
(412)770.5285
Gabriel.alkhdour@hotmail.com

22